## Interstate Coal Co. v. Shelton, Admr.

(Decided February 7, 1913.)

## Appeal from Knox Circuit Court.

1. Witnesses—When May Not Testify as to Opinion.—A witness may not testify to his opinion as to whether a certain plank, if nailed, would have slipped, when an iron shaft was thrown off.

2. Experts—When May Testify to Hypothetical Question.—An expert may testify to a hypothetical question or to the strength of timbers, but whether a given plank would have slipped, if nailed, must be determined by the jury under the proof.

3. Evidence—Repairs After Accident May Not Be Proved to Show Negligence.—Repairs made after an accident may not be proved to show negligence, and the fact that a plank was nailed after the accident may not be shown as proof that it was not nailed before.

4. Master and Servant—Safe Place to Work.—The master must use ordinary care to furnish a servant a reasonably safe place to work considering the purpose for which the place was intended and the strains that may be reasonably anticipated.

5. Master and Servant—Failure of Servant to Exercise Ordinary Care —When Servant Cannot Recover for Injury.—If the servant subjects the platform to a strain to which in the exercise of ordinary care he should not have subjected it, and but for this, would not have been injured, he cannot recover.

P. D. BLACK, JAMES D. BLACK, B. B. GOLDEN and HIRAM H. OWENS, for appellant.

J. M. ROBSION, for appellee.

OPINION OF THE COURT, BY CHIEF JUSTICE HOBSON.— Reversing.

Lee Hamblin was in the service of the Interstate Coal

Company as striker in the blacksmith shop or assistant of the blacksmith, Will Trosper. The company maintained a coal tipple from which coal was dropped into a shaker by means of which the fine coal was separated from the larger lumps. The shaker rested on an iron shaft about three inches in diamater and about eleven feet long. A platform had been built for the use of the workmen about the shaker. This platform was eighteen feet above the ground. The floor of the platform was composed of oak plank two inches thick and ten or twelve inches wide, twelve feet long. The frame upon which the floor rested was eleven feet long so that the ends of the plank projected a few inches beyond the timbers they rested on. On May 20, 1910, Trosper received an order from the superintendent of the mine directing him on that night to take out the shaft supporting the shaker, and to put in a larger shaft. Three other men in addition to his assistant, Hamblin, were assigned to help him on the job. The reason for doing the work at night was not to interrupt the use of the shaker during the day. That night, Trosper, with the four hands assigned to him after dark went upon the platform and took out the bolts which fastened the shaft. He then directed Hamblin and a man named Dawson, who was one of the men assigned to assist him, to take the shaft out. Hamblin and Dawson got the shaft out on the platform, Trosper being on the opposite side of the shaker from them and a few feet away. When Hamblin and Dawson had the shaft on the platform, Hamblin said to Dawson that he would throw it off. Dawson said "No, it might break it." Hamblin said no that was the way that he and Trosper had done before. Trosper, who was in hearing, said nothing, and Dawson then said, "Wait until I get in the clear." He then got to one side, and as soon as he did this, Hamblin pushed the shaft off the platform, one end of it being already on the edge or over the edge. When Hamblin threw the shaft off, the center plank of the platform fell through it, and Hamblin, who was standing on this plank, fell through with it, he and the plank both falling into a coal car that was setting under the platform. He struck on his head and was killed. This suit was brought by his personal representative to recover for his death on the ground that the company was negligent in failing to furnish him a reasonably safe place to work; that the planks in the platform were not nailed, and that

the structure was a dangerous one for the purpose for which it was intended. The proof introduced on the trial conduced strongly to show that Hamblin's fall was due to the plank on which he was standing, slipping until the end opposite to the place where the shaft was thrown off, had slipped off the girder and that this plank was not fastened or secured in any way. There was proof for the defendant that there was a collar on the shaft; also some other attachments, and that there was a scar on the end of the plank, indicating that the shaft as it fell, struck the plank, and so caused it to fall. There was also proof for the defendant that the planks constituting the floor of the platform were securely nailed with large nails six inches long. The jury found for the plaintiff in the sum of $6,000. The court entered judgment on the verdict and the defendant appeals.

It is insisted for the defendant that the court should have instructed the jury peremptorily to find for it because the evidence does not definitely show how Hamblin came to fall and shows that he voluntarily threw the shaft off and but for this would not have been killed. The men were working in the dark with no light except miner's lamps in their caps, but each could see the other's light. Both Trosper and Dawson saw Hamblin fall, and his position in the car as well as the hole in the platform, and the plank which also fell in the car, showed definitely how the accident happened. While it is true that Hamblin would not have been hurt if he had not thrown the shaft off, it is also true that throwing the shaft off, would not have caused any trouble if the plank had been securely fastened. Trosper, under whom he was working, had done the work in the same way on a previous occasion, and Trosper, who was in charge of the work, made no objection to his suggestion that they should throw the shaft off. It cannot be said, therefore, that he was acting outside of the scope of his duty, and the circuit court properly refused the peremptory instruction asked by the defendant.

The witness, Will Trosper, was asked to tell the jury, whether the plank that fell was nailed, and answered that he did not know. He was then asked to give his best judgment about it and said he did not know whether it was nailed or not. The attorney insisted that he wanted his best judgment as to whether the boards were nailed, and he then answered, "My judgment is they were not

nailed, I don't know.'' He was then asked to tell the
jury from his knowledge of the boards and the handling
of the shaft whether if the board had been nailed it would
have been pulled off its support, and said he didn't know,
it might or it might not. The attorney then said that
he did not ask for his knowledge but for his opinion on
the subject and he said it would depend on the nails, that
the board would not have been jerked off if it had been
nailed with large nails. There was a similar course of in-
terrogation with three other witnesses. None of this evi-
dence should have been admitted. ' The jury could judge
of the matter just as well as the witnesses. None of them
were experts on the subject of the strength of timbers
or nails, and in fact, the matter asked about was not a
subject for expert testimony. An expert might testify
as to the strength of certain nails or the strength of cer-
tain timbers, and all the witnesses might testify to every
fact they knew; but the conclusion to be drawn from the
facts was for the jury and not for the witnesses.

The plaintiff was allowed to prove by several wit-
nesses that when they returned to the platform to finish
the work after taking Hamblin away, a servant of the
Company was up on the platform nailing the planks
down. He was also allowed to prove by other witnesses
that they examined the platform the next day and saw the
heads of nails which looked fresh and had but recently
been driven in to hold the floor of the platform. There
was other proof showing that some days later additional
planks were put on and the platform made more secure.
All of this evidence should have been omitted. The rule
is that repairs made after an accident may not be shown
to prove that the thing was not in a good condition before
the accident. (L. & N. R. R. Co. v. Morton, 121 Ky. 398;
L. & N. R. R. Co. v. Stewart, 131 Ky., 665; Black Diamond
Coal Co. v. Price, 33 R. 334.) The circuit court charged
the jury that they should consider this evidence only for
the purpose of proving the condition of the platform at
the time of Hamblin's injury, and it is insisted that the
fact that nailing was done there just after the injury, is
evidence that the planks were not properly secured be-
fore. We cannot see the force of the distinction. Such a
distinction, if maintained, would allow such evidence in
all cases. One plank had fallen off the platform; it was
natural that when this plank was placed back in position,
it should be nailed down and as an accident had occurred,

it was not unnatural that the man who did the nailing would nail other planks for safety sake. The question in the case is, was the plank securely nailed before Hamblin fell? To allow proof that the defendant made it secure after he fell as tending to show that it was not safe before would be to place the defendant in the position that it could not make repairs on its property without this being taken as an admission that its want of repair had caused the accident, and would have a tendency to deter the making of repairs after an accident had happened, though in fact needed.

The plaintiff proved by one witness that he was working on this platform about a week before the accident, and while working there had occasion to move one of the planks of the platform. He could not state definitely which one; and that this plank was not nailed but loose. This evidence was properly admitted because the platform was a whole, and the fact that one of the planks was loose was a circumstance tending to show that the planks were not securely nailed. This proof taken in connection with the other facts shown on the trial was sufficient to warrant the conclusion that the planks had not been nailed as testified to by a witness for the defendant, but had simply been laid on the platform loose.

There was sufficient evidence to take the case to the jury, but for the errors we have named in the admission of evidence, the judgment must be reversed. On another trial in Instruction 1, in lieu of the words, "it was the duty of the defendant, the Interstate Coal Company, to furnish to the deceased, Lee Hamblin, a reasonably safe place, etc.," the court will tell the jury that it was the duty of the defendant to use ordinary care to furnish to the deceased, Lee Hamblin, a platform to work on that was reasonably safe under such strains as might be reasonably anticipated in the uses for which it was intended. The master is not an insurer of the safety of his premises. He is only required to use ordinary care to make them reasonably safe for the uses for which they are intended. (Big Hill Coal Co. v. Abney, 125 Ky. 255.) We do not find anything in the evidence warranting the 3rd. or the 6th. instructions given on the motion of the defendant, and on another trial, both of these instructions will be omitted. In lieu of the 5th. instruction the court will tell the jury that it was incumbent on Hamblin to use ordinary care for his own safety, and if he put on the floor

of the platform a strain which in the exercise of ordinary, care he should not have put on it, and but for this would not have been injured, they should find for the defendant.

Judgment reversed and cause remanded for a new trial.