# Perkins-Harlan Coal Co. v. Creech's Adm'r.

(Decided Feb. 12, 1937.)

WILLIAM SAMPSON for appellant.

R. L. POPE, J. O. BAKER and FORESTER & SHEHAN for appellee.

OPINION OF THE COURT BY JUDGE STITES—Reversing.

Lawrence Creech, a young coal miner of the age of 22, was killed on January 9, 1934, by the fall of a piece of rock, while working in the coal mine of the appellant, Perkins-Harlan Coal Company, at Liggett, Ky., in Harlan county. Although eligible to do so, the appellant company has never elected to operate under the Workmen's Compensation Law (Ky.St. sec. 4880 et seq.). Creech had been employed by the appellant as a "loader" for some months prior to the date of the accident, and following his death this action was brought by his administrator to recover damages therefor from the appellant. Since appellant is not operating under the Workmen's Compensation Law, it is, under the provisions of that law, deprived of the defenses of assumed risk and contributory negligence, and the sole question

presented is whether or not appellant itself has been shown to be guilty of the negligence alleged in the petition, and, if so, whether such negligence was the proximate cause of Creech's death. It is claimed in the petition as amended that the appellant was guilty of two distinct acts of negligence which contributed to, or brought about, Creech's death. It is alleged that appellant had negligently adopted an improper system or method of mining which resulted in making dangerous the place in which Creech was required to work, and it is likewise claimed that the appellant negligently reduced the size of the pillar between room No. 7 on thirteenth left entry, where Creech was working, and room No. 8 adjoining thereto, and permitted the employees working in room No. 8 to break through the wall between the two rooms, thus creating an extraordinary span of 70 feet between the two rooms without support.

A map of appellant's mine is filed in the record. Roughly, the mine may be described as in the form of a racing shell, with the main entry represented by the boat itself and the cross-entries by the oars. Commencing with the mouth, or entrance, of the mine, the cross-entries are designated consecutively as "1st Right, 1st Left, 2d Right, 2d Left," and so on up to the head of the main entry, which extends something over a mile into the mountain. At the time of the accident here complained of, Creech was working in room No. 7 on "13th Left Entry." He was engaged in advance work, removing the coal from the face of room No. 7 at the point farthest from the neck, or entrance, of the room. Left entries 10, 11, and 12 had been almost completely "robbed," and left entry No. 9 had been partially "robbed" at that time. A fall had occurred in these entries, which, it is claimed by appellant, operated to reduce the weight of the mountain over the remainder of the mine, but which, it is claimed by appellee, indicated that the mountain was "taking weight," or settling, thus rendering the roof of thirteenth left entry more than ordinarily insecure and dangerous. Advance work—that is, the digging out of the entries and rooms—was proceeding in a number of entries beyond thirteenth left entry, but the only "robbing" that had been done was between thirteenth left entry and the mouth of the mine.

It is claimed by appellee that the proper method

to be adopted in the operation of a coal mine is to drive up all the rooms first and then, beginning at the head of the back entry, to rob back to the drift mouth. Opposed to this contention, it is urged that such a method of mining would result in placing the entire weight of the mountain at one time on the pillars and stumps in the various rooms and entries and be even more hazardous than the method actually pursued. It is shown that when the mountain commences "taking weight," there is first a more or less horizontal settlement, followed by a "pitch" toward the weakest point in the support, resulting, if the support gives way, in a cave-in or fall of the roof of the mine at that point until sufficient rock or earth is fallen into the mine to support that which is above. Where the vein dips or "swags," as it is shown to do in the mine here involved, with the result that all entries or rooms are not on the same level, it is clear that, all other stresses and strains being equal, the "pitch" would be toward the lowest opening, with the result that a comparatively small number of pillars or stumps would thus be forced to carry a stupendous weight, if appellee's theory was followed. It is not shown that mines generally in the Harlan district followed the method of mining which appellee contends to be the proper one, but, on the contrary, some of appellee's own witnesses admit that the method followed in the Perkins-Harlan mine was the same as that generally used in that locality. The only mine in the district claimed by any of appellee's witnesses to follow a different method of mining is shown to be in a rather unique situation with comparatively little weight above the vein of coal. Certanly this falls far short of indicating a failure on the part of appellant to exercise ordinary care to adopt a reasonably safe method of mining.

One witness testified that the ideally safe method of mining would be to drive the main entry of the mine to its farthest extent before commencing to dig any cross-entries, then to commence any cross-entries at the back end of the main entry and to drive up each entry and rob it before proceeding to the next entry, and thus retreat to the mouth of the mine. It is shown that this method is used in some mines in districts where they are particularly deep, but it is not shown to be the usual or ordinary method of mining

in Harlan county or, indeed, to be the method followed in any of the mines in that district. It is, of course, the theory of this method that the solid coal between the cross-entry at the back end of the main entry and the mouth of the mine will assist in the support of the mountain, and the "pitch" of the weight will continually be toward the back of the mine, behind the workers, instead of being between them and the mouth of the mine.

The theory of mining adopted by appellant, and shown to be the usual method followed in the Harlan district, seems to be a modification of each of the two methods above mentioned. As the cross-entries and rooms are driven up in appellant's mine, they are immediately robbed from the back of the cross-entry toward the main entry, and, if no fall occurs naturally, the ceiling of the cross-entry is dynamited in order to produce a fall and thus to relieve the stress on the span above the walls of the entry and likewise to take the weight of the mountain, so far as possible, off the walls and pillars of the adjoining cross-entries.

It is shown that a fall had actually occurred in cross-entries 10, 11, and 12 left, adjoining the entry in which appellee's decedent was working. It is likewise shown that there was a dip in the vein in cross-entry 12 left, which naturally would place additional weight on the walls and pillars of that entry. This additional weight, according to the testimony, was relieved by the fall which had occurred some weeks before the date of the accident here complained of.

If this were a case where a miner had been cut off from egress from the mine by a fall between him and the mouth of the mine, it might reasonably be said that robbing the entries between his working place and the mouth of the mine had some causal connection with such a situation. Here, however, the particular "pitch" of the weight resulting from the method of mining pursued could not have affected the fall of this particular piece of rock one way or the other. There was just as much chance for the rock to loosen and fall whether the method of mining adopted involved working forward or backward, or whether decedent was doing advance work or robbing. Under any theory there was necessarily a shifting of weight which might tend to

loosen the roof of the rooms. Gatliff Coal Co. v. Hill's Adm'r, 263 Ky. 309, 92 S. W.(2d) 56. It thus seems clear that the proof fails to indicate any showing of negligence in the method of operation used which could be said to have been the proximate cause of the injuries complained of.

It is next insisted for appellee that the coal company was negligent in permitting its diggers to cut the pillar between rooms 7 and 8 in two and thus to reduce the thickness of the pillar between these rooms. The proof shows that, in driving its cross-entries, appellant dug out its room entries at 70-foot intervals. It is likewise shown that, instead of using a 70-foot interval when it came to room No. 8, appellant reduced the width of the pillar between rooms 7 and 8. It is shown without dispute that, when room No. 8 was first started, the entry was made at the regular 70-foot interval, but that a large rock fell into the entry thus made, and it became necessary to drop back closer to room No. 7 and commence a new entrance at a point where one might safely be driven. In view of this unusual condition, appellant erected six "cribs" consisting of cross-ties laid one upon another in such a way as to give additional support to the roof. Three of the cribs were placed in room No. 7 where decedent was working, and three were placed in room No. 8. It is not shown that the fall of the rock in the original entrance to room No. 8 resulted from any negligence on the part of appellant. The proof indicates that unusual precautions were taken in view of the situation which developed.

It was the duty of the master to exercise ordinary care to furnish to the servant a reasonably safe place in which to work. He is not an insurer. Interstate Coal Co. v. Shelton, Adm'r, 152 Ky. 92, 153 S. W. 1. Certainly the master did not become an insurer merely by virtue of the unusual condition that developed on room No. 8. It was its duty still to exercise ordinary care to furnish a reasonably safe place in which to work. Under the circumstances presented, this involved taking added precautions to protect the servants working in the vicinity of room No. 8, but there is an affirmative showing here that such added precautions were actually taken. There is nothing to show that, in erecting the six cribs, the master did not do

everything reasonably possible, short of abandoning its operations, to guard against the additional hazard.

It is not claimed that the decedent was not aware of the conditions surrounding him. On the contrary, it is shown that he undertook to "timber up" the very rock that fell on him, but did not place the timber in the proper place to afford himself protection. There was no claim that appellant was negligent in failing to warn decedent of the danger.

We are unable to find any facts upon which to predicate a finding that appellant was guilty of negligence either in its method of operation or in its handling of the unusual situation which occurred in the entry where decedent was working. It follows that it was entitled to the peremptory instruction for which it asked at the close of all the testimony. High Splint Coal Co. v. Baker, 247 Ky. 426, 57 S.W.(2d) 60. All other questions are reserved.

Judgment reversed.